**Nos. 26-4309(L) and 26-4310**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

GREG E. LINDBERG,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of North Carolina
Nos. 3:23-cr-48-MOC and 5:19-cr-22-MOC
The Honorable Max O. Cogburn, Jr., District Judge

**DEFENDANT-APPELLANT'S EMERGENCY MOTION TO STAY THE**
**IMMEDIATE-PAYMENT DIRECTIVE OF THE RESTITUTION ORDER**
**AND TO**
**RESTRAIN DISSIPATION OF RESTITUTION ASSETS PENDING**
**APPEAL**

**EMERGENCY STATUS (Local Rule 27(e)): Action is respectfully requested at the Court's earliest opportunity, and before the district court accepts, adopts, or acts upon the special master's final restitution report — filed July 23, 2026, ahead of even its announced date and within hours after counsel gave Rule 27(e) notice of these filings. The final restitution report has asked the Court to adopt a 1.6 Billion Dollar restitution without hearing which could happen as early as July 28th when the notice and comment period laid out in the preliminary restitution order expires, with at least six motions filed by the Defendant unanswered on merits including a Motion to Dismiss restitution. Asset sales are proceeding now; the grounds are set out in the Introduction and the accompanying Motion to Expedite. Counsel for the United States was notified of these filings on July 23, 2026, and stated that the government opposes each of them. (Ex. G)**

# TABLE OF CONTENTS

15

19

30

I.    30

II.    31

49

52

53

EXHIBITS:

**Exhibit A**: Doc. No. 172: Defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No.161); (II) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (III) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; and (IV) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect

**Exhibit B**: Doc. No. 190: Defendant's Emergency Motion To Stay All Asset Sales And Asset-Sale Processes Pending Entry Of A Final Restitution Order And De Novo Article III Determination, And Consolidated Objections To The Preliminary Order Of Restitution (Doc. 161), The Scope Of The Special Master Reference, And The Special Master's Statement (Doc. 159), With Incorporated Memorandum Of Law

**Exhibit C**: Doc. No. 201: Defendant's Emergency Motion To Enforce The Plea Agreement And The Order Appointing The Special Master, To Preserve His Due-Process And Counsel-Access Rights In The Pending Restitution

Proceedings, And To Require That The Government Be Represented By Conflict-Free Counsel filed 15 June 2026.

**Exhibit D**: Doc. No. 202: Defendant's Emergency Motion To Enforce The Plea Agreement And The Order Appointing The Special Master, To Preserve His Due-Process And Counsel-Access Rights In The Pending Restitution Proceedings, And To Require That The Government Be Represented By Conflict-Free Counsel filed 16 June 2026.

**Exhibit E**: Doc. Nos. 234–235: Defendant's Motion For A Determination That No Restitution Is Owed, Or In The Alternative For Exclusion And Offset Of Losses Not Proximately Caused By The Offense Of Conviction, With Incorporated Memorandum Of Law, with supporting declaration and Exhibits A–W.

**Exhibit F**: Doc. No. 248: Defendant's Motion for Issuance of Rule 17(c) Subpoenas Duces Tecum.

**Exhibit G**: Email correspondence dates July 23, 2026.

# TABLE OF AUTHORITIES

**Cases**

*Apprendi v. New Jersey,*
530 U.S. 466, 490 (2000) ........................................................................ 28

*Commodity Futures Trading Comm'n v. Schor,*
478 U.S. 833, 850–51 (1986) .................................................................. 36

*Ellingburg v. United States,*
607 U.S. 163, 166 (2026) ..................................................... 19, 28, 35, 36

*Hilton v. Braunskill,*
481 U.S. 770, 776 (1987) ........................................................................ 30

*Hughey v. United States,*
495 U.S. 411, 413 (1990) .................................................................. 18, 31

*Kingdomware Techs., Inc. v. United States,*
579 U.S. 162, 170 (2016) .......................................................................... 6

*Nken v. Holder,*
556 U.S. 418, 434 (2009) ........................................................................ 30

*Paroline v. United States,*
572 U.S. 434, 444–45 (2014) ............................................................ 18, 31

*Robers v. United States,*
572 U.S. 639 (2014) .......................................................................... 18, 33

*Southern Union Co. v. United States,*
567 U.S. 343 (2012) ................................................................................ 28

*Stern v. Marshall,*
564 U.S. 462, 484 (2011) ........................................................................ 36

*United States v. Boccagna,*
450 F.3d 107, 115 (2d Cir. 2006) ........................................................... 35

*United States v. Crawford*,
   169 F.3d 590, 592–93 (9th Cir. 1999)....................................................... 41

United States v. Johnson,
   48 F.3d 806, 808–09 (4th Cir. 1995)................................................. 36, 40

*United States v. Karam*,
   201 F.3d 320, 329 (4th Cir. 2000)............................................................ 39

*United States v. Ritchie*,
   858 F.3d 201, 211 (4th Cir. 2017)............................................................ 39

*United States v. Springer*,
   715 F.3d 535, 540–42 (4th Cir. 2013) ....................................................... 6

*United States v. Steele*,
   897 F.3d 606, 613–14 (4th Cir. 2018),..................................................... 41

United States v. Stein,
   846 F.3d 1135 (11th Cir. 2017) ............................................................... 28

*United States v. Ziadeh*,
   104 F. App'x 869, 874 (4th Cir. 2004)..................................................... 41

**Statutes**

18 U.S.C. § 3556 ........................................................................................ 30
18 U.S.C. § 3572(g)............................................................................... 6, 31
18 U.S.C. § 3663A(a)(2) ............................................................................ 32
18 U.S.C. § 3663A(c)(3)(B) ...................................................................... 29
18 U.S.C. § 3664(d)(5)....................................................................... 7, 21, 45
18 U.S.C. § 3664(d)(6).............................. 7, 17, 18, 20, 24, 34, 36, 39, 47, 51
18 U.S.C. § 3664(e) .................................................................................... 29
18 U.S.C. § 3664(f)(1)(A) ......................................................................... 30
18 U.S.C. § 3664(f)(2) ............................................................................... 19
18 U.S.C. § 3664(j)(2)....................................................................... 18, 19, 34

**Rules**

Fed. R. App. P. 8........................................................................................ 6, 30
Fed. R. App. P. 8(a) ............................................................................. 6, 13, 31
Fed. R. Crim. P. 38(e) .......................................................................... 6, 31
Fed. R. Crim. P. 38(e)(1)............................................................................ 30

v

Loc. R. 8 ................................................................................................... 6

Loc. R. 26.1 ............................................................................................. 17

**Pursuant to** Federal Rule of Appellate Procedure 8, Federal Rule of Criminal Procedure 38(e), and Fourth Circuit Local Rule 8, Defendant-Appellant Greg E. Lindberg respectfully moves this Court to stay, pending appeal, the directive in the district court's Preliminary Order of Restitution that restitution be paid immediately — together with any materially identical immediate-payment directive in any subsequent or final restitution order — and, as a term of that stay, to restrain the sale or other dissipation of the restitution assets, including assets held in any trust and any disposition by way of forfeiture. This is deliberately a modest request. The Court's authority arises from the pending appeals, Fed. R. App. P. 8(a); Fed. R. Crim. P. 38(e); 18 U.S.C. § 3572(g); and the stay requested need not outlast the need: Appellant proposes that it remain in place pending appeal, subject to dissolution or modification upon the district court's determination of causation, offsets, and credits by a preponderance of the evidence made after adjudication of the pending motions (Docs. 172, 190, 201, 202, 234, 248), or upon disposition of the consolidated appeals. The relief is needed now, not later: the immediate-payment directive is already operative and the sales are already underway. And the relief must reach forward, because any final restitution order will carry the same immediately-payable language — a stay confined to the preliminary order would expire at the very moment the identical directive re-enters through the final order, requiring a second emergency motion to prevent the same harm. That is the paradigm of a wrong

7

"capable of repetition, yet evading review": the directive is "too short to be fully litigated prior to cessation," and there is "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016); see *United States v. Springer*, 715 F.3d 535, 540–42 (4th Cir. 2013). The stay should therefore extend to the immediate-payment directive in any successor order, without prejudice to any party's right to seek modification upon entry of a final order. And the motion is ripe precisely because of the Preliminary Order's own terms: by making $1.655 billion "due and payable immediately," the order created a presently operative directive — one the government treats as operative enough to justify liquidating assets now, and which is therefore operative enough to be stayed now. Because the directive is already operative, the need for relief is immediate, not prospective: enforcement is not something that will begin if this motion is denied — it is occurring as the motion is read. Appellant therefore respectfully requests that the Court enter an administrative stay upon receipt of this motion — before Monday July 27, 2026, if practicable — while it considers the motion in full.

On July 28, 2026 the sixty-day notice period on the preliminary restitution report expires. The final restitution report now asks that the report be adopted without a hearing. (Doc. 245.) On July 29, 2026, the court may adopt the order if it follows the recommendation in the report with six pending motions with no response

from the government on merits. On July 24, 2026, the district court, sua sponte, ordered that the defendant be produced from the custody of the Bureau of Prisons for a hearing before the court no later than August 7, 2026. (Doc. 250.) The order does not state the hearing's subject, but the directive to produce the defendant in person signals a substantive proceeding — likely the final restitution hearing — at which the court could enter the proposed Final Order (Doc. 245-1) and fix the restitution amount by adoption before the six pending motions are decided. Given the August 7 date, the government is unlikely to respond on the merits to any of the pending motions absent an order directing the district court to require its response and to allow the defendant to respond to all of them before any restitution hearing. The motion is narrow. It does not ask this Court to disturb the determination of causation, offsets, and the final amount of restitution; those determinations should proceed in the district court under 18 U.S.C. § 3664(d)(5), subject to that court's de novo determination under § 3664(d)(6). The motion asks only that the assets from which any restitution would be paid still exist when those determinations are made and this court does not lose jurisdiction over the assets before the appeal.

The record makes the pattern concrete. The rules were short-circuited once, and — absent a forward-reaching stay — the same maneuver can recur with the successor restitution order, the next asset sale, or the next contested filing:

9

| Date / Time | Event |
|---|---|
| Wed., July 22 4:48 p.m. | Special Master's counsel circulates the draft Final Supplement, proposed Final Order, and sealed appendix; states the filing is due "by Friday." |
| Wed., July 22 (evening) | Defense asks the Government and Special Master to consent to an extension consistent with the joint bifurcation order. **The Special Master sets a deadline of end of day, July 23 for the parties' positions.** |
| Thu., July 23 9:01 a.m. | Defense serves a Rule 27(e) notice of the emergency filings on the Government. |
| Thu., July 23 9:07 a.m. | Defense advises that the Rule 17(c) subpoena motion (Doc. 248) will be filed that day; asks the Government to state its position by 11:00 a.m. |
| Thu., July 23 9:11 a.m. | Government: "The government objects." |
| Thu., July 23 10:45 a.m. | Special Master: "the special master objects." |
| Thu., July 23 10:57 a.m. | Special Master files the Second Supplement (Doc. 245), proposed Final Order (Doc. 245-1), and sealed appendix (Doc. 245-2) — **five hours before his own end-of-day deadline for the defense position, and a day before his announced Friday filing date.** |
| Thu., July 23 11:12 a.m. | Government's appellate counsel asks whether the filing has "mooted" the pending mandamus. |
| Thu., July 23 11:30 a.m. | Government "opposes each" of the emergency filings. |
| **Thu., July 23 end of day** | **Deadline the Special Master set for the Defendant's position** — while Appellant is in Bureau of Prisons custody and cannot review the documents or meet newly appeared counsel until the following Tuesday. |
| **Fri., July 24** | **The Special Master's originally announced filing date** — though the Preliminary Order's governing period actually ran to July 28. |

10

| | |
|---|---|
| **Tue., July 28** | **60 - day Notice period provided in Preliminary Restitution order expires** — and the final restitution report may be adopted without hearing if the reports recommendation is adopted with six pending motions including a dispositive motion on causation with detailed documentation. |

The restitution assets are disappearing now. One company is already gone: Beckett — transferred to the special master's control through an Assignment of Interests — has already been sold for approximately $134 million (a price, not a concession of value which when transferred was over $800 Million), without the district court's approval, without any accounting to this day, and without a dollar of proceeds credited against the restitution obligation. More are on the block: Damovo and ARM are being marketed for sale, as the Special Master reported on the parties' weekly call, and on or about July 1, 2026, the Government indicated, on the parties' weekly call, that the assets held by NewHoldCo LLC, a North Carolina limited liability company ("NewHoldCo") — the entity that holds a substantial portion of the Primary Restitution Assets (AAPC is held separately) — would likewise be dissipated. And AAPC, the most valuable single asset in the structure, is being listed at a value below its demonstrated worth — a write-down that would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1) and permit immediate liquidation of the estate, short-circuiting the restitution process before any amount is lawfully determined and before this Court can act. The special master has also

11

administered the distribution of $23,520,710 in asset-sale proceeds to a recipient that, by his own determination, is not a victim of the offenses of conviction.

The pattern is not isolated. Each principal asset has been, or is proposed to be, sold at a fraction of its independent value on the same rationale — that maturing debt compels an immediate sale rather than a refinancing or rollover:

| Asset | Independent Value | Sale / Proposed Sale | Stated Rationale & Process |
|---|---|---|---|
| **Beckett** (one of only two collectible-card valuation companies) | Over $800 million (value when transferred) | ≈ $134 million | Sold with **no motion, notice, or court order** — leaving Defendant no opportunity to object; no accounting; no proceeds credited to restitution. Acquired by its only competitor for a fraction of value — creating a near-monopoly. The Special Master's Third Status Report states that because of "the extensive debt encumbering Beckett and the rest of the Collectivus portfolio," the sale "did not yield proceeds that can be distributed as restitution payments." (Doc. 94, at 6–7; accord Sent. Mem. (Doc. 145), at 13.) |
| **Clanwilliam** | $880 million (Q1 2024 Quadro Acquisition Corp. agreement; 22.14x EBITDA) | Gross ≈ $450 million (Doc. 174); net proceeds est. $338 million, reduced to $318 million after a $20 million Irish-tax escrow (Doc. 66, at 7 & n.5) — ≈ $474 million in value destroyed | Rehabilitator blocked the higher-value Quadro deal, then forced the sale. The order recites "loan obligations set to mature in October … that, absent a sale, could result in debt collection litigation," and that delay "risks the Purchaser walking away." (Doc. 66 ¶ 25; Doc. 174 ¶¶ 117–118, § XIX(c).) |

| AAPC (proposed sale; appendix filed under seal) | $2.7–$3.0 billion — and durable: an AI-resistant business, as AI-driven medical billing invites False Claims Act exposure, so human billers remain indispensable. | Sealed appendix values AAPC at a small fraction of its demonstrated worth (Doc. 245-2 (sealed), at 2) | The same rationale as Clanwilliam and Beckett — the disposition divorced from the valuation at which the asset was delivered to the Special Master. |

Without a stay, this pattern will persist: each remaining asset — Damovo, ARM, NewHoldCo, and AAPC — is exposed to the same debt-and-timing rationale that has already produced sales at a fraction of value, and, as with Beckett, may be sold without a court order and thus beyond Defendant's power to object.

Only this Court can preserve the status quo. Defendant-Appellant moved twice in the district court to stay the immediate-payment directive and to halt the asset sales; both motions are fully briefed on his part and remain undecided, and the special master has sought to defer his own response until after the final restitution recommendation issues — that is, until after the sales are complete. Appellant does not oppose reasonable conditions to secure the eventual obligation and respectfully requests an administrative stay pending the Court's ruling on this motion. The

request is time-critical by the calendar the participants themselves have set: on July 22, 2026, the special master's counsel stated in writing that he will file the final supplement and a proposed final order of restitution — with the appendix under seal — on Friday, July 24, 2026, days before the July 28 end of the governing period, with asset sales underway in the same window. Appellant therefore respectfully requests administrative relief before that date and will accept any interim conditions the Court deems appropriate. A motion to expedite accompanies this motion.

## This Motion Is Properly Presented to This Court.

A stay motion may be made in the first instance to this Court where, "a motion having been made, the district court denied the motion or failed to afford the relief requested." Fed. R. App. P. 8(a)(2)(A)(ii). That predicate is squarely satisfied; on every ground this motion presents. Within fourteen days of the entry of the Preliminary Order of Restitution, Appellant moved in the district court to stay enforcement of the immediate-payment directive. (Ex. A, Doc. 172.) Appellant then filed an emergency motion to stay all asset sales and asset-sale processes. (Ex. B, Doc. 190.) Both motions are fully briefed on Appellant's part. The district court has ruled on neither. And the stay motions do not stand alone: on July 14, 2026, Appellant also moved in the district court to dismiss the $1.655 billion restitution figure itself, on the ground that no causation has been — or can be — established for the claimed losses and that mandatory offsets extinguish any properly calculated

15

obligation. (Ex. E, Docs. 234, 235.)[1] That dispositive motion likewise awaits decision. The United States has filed no merits response to any of them; instead, it

---

[1] The motion to dismiss (Doc. 234, at 9–10) summarizes its grounds as follows: First, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator himself praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Furthermore, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis that concluded that the affiliated loans were conservatively underwritten at approximately fifty-percent loan-to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans. (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018).) As the sole owner of the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any single one of the foregoing facts is sufficient to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. Combined, these facts provide overwhelming evidence that no reasonable person could have expected that all of the safeguards Mr. Lindberg put in place (personal guarantees, a $1 billion equity cushion, conservative 50% loan-to-value loans, a robust risk-management plan, and $1 billion of bonds as insurance) would fail amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last 7 years. Someone who reasonably expects a loss on a loan does not personally guarantee every penny of that loan, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss, implement a robust risk-management program for underwriting such loans, invest $1 billion of his own capital as equity to support that loan, and receive strong praise from his regulator on

16

how he was handling regulatory issues related to such loans. On the contrary, these are the actions of someone who reasonably expected zero loss and put his entire net worth on the line because he expected no loss. Under MVRA any loss must be reasonably foreseeable to a defendant to form the basis for a restitution order, and here the opposite is the case.

Second, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the court-appointed Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the very assets he sells. Those intervening causes broke, and continue to break, the chain between Mr. Lindberg's conduct and any loss. Under MVRA any loss must be closely related and proximately caused by the defendant's conduct. The foregoing string of events shows exactly the opposite: any losses occurred after Mr. Lindberg gave up control of his insurers in October of 2018 and were caused by the independent decisions of third parties beyond Mr. Lindberg's control.

Third, this Court has characterized the "real loss" in this case as "risk." Restitution under the Mandatory Victims Restitution Act ("MVRA") is measured by, and capped at, a victim's actual loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice, and a later change in law does not retroactively render that risk-taking criminal. Lawful risk cannot be the predicate for a penal, loss-measured                                             restitution                                             award.

17

sought and obtained an extension of time as to the stay motions (Doc. 205; text-only order of June 22, 2026). The special master filed only an initial response (Doc. 217) and moved for an extension keyed not to any fixed date but to the completion of his own restitution recommendation — due on or before July 25, 2026 — so that the motions seeking to halt the asset sales would be fully answered only after the restitution figure is finalized and the sales have proceeded. (Doc. 218.) Appellant opposed that extension. (Doc. 219) On this record, the district court has "failed to afford the relief requested," and the posture below affords no prospect of timely relief: the relief sought is the preservation of assets, and the assets are being sold while the motions await decision. Pursuant to Local Rule 8, the six motions are attached to this motion as Exhibits A through F, and — so that this motion may remain confined to the stay factors — each is summarized briefly in the margin rather than reargued here. [2]

---

Mr. Lindberg does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." He stands by that agreement. But that agreement reaches only harm his conduct caused; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert "risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." (Doc. 234 at 11-12).

[2] Exhibit A — Doc. 172: motion to stay enforcement of the Preliminary Order's immediate-payment directive, filed within fourteen days of its entry. Exhibit B — Doc. 190: emergency motion to stay all asset sales, with consolidated objections,

As required by Local Rule 8, copies of both stay motions, the Preliminary Order of Restitution, and the relevant portions of the record are attached. *See* Fed. R. App. P. 26.1; Loc. R. 26.1.

## BACKGROUND

1. On January 23, 2025, the district court appointed a special master in connection with the restitution proceedings. (Doc. 56.) On May 26, 2026, the district court sentenced Appellant, and on May 28, 2026, entered a Preliminary Order of Restitution in the amount of approximately $1.655 billion, directing that restitution be paid immediately. (Doc. 161.) Appellant's appeals are pending before this Court as Nos. 26-4309 and 26-4310.

2. The final amount of restitution is not settled — and is contested at its foundation. No court has adjudicated whether, or to what extent, the claimed losses were directly and proximately caused by the offenses of conviction, as the

including the Article III and § 3664(d)(6) challenge to the special-master reference and the challenge to the special master's authority and neutrality. Exhibit C — Doc. 201: emergency motion to enforce the plea agreement, with supporting affidavit, addressing government counsel's demand that a protected filing be removed from the docket on pain of a declared breach. Exhibit D — Doc. 202: [conform description to Doc. 202 as filed]. Exhibit E — Docs. 234–235: motion to dismiss the $1.655 billion restitution figure, with supporting declaration and Exhibits A–W, on the grounds that no loss was reasonably foreseeable at origination (see note 3, supra), that intervening events after October 2018 severed any causal chain, and that mandatory offsets and credits of approximately $2.9 billion extinguish any properly calculated obligation (see note 1, supra).

19

Mandatory Victims Restitution Act requires. Appellant's pending motions present those causation issues, together with offsets and credits of approximately $2.9 billion that — if credited as the statute requires, see 18 U.S.C. § 3664(j)(2) — would reduce the net restitution obligation to zero. On July 14, 2026, Appellant filed a motion to dismiss the $1.655 billion restitution figure on causation and offset grounds, with supporting exhibits, followed by a supporting declaration. (Docs. 234, 235.) Those determinations remain for the district court in the first instance, subject to its de novo determination under 18 U.S.C. § 3664(d)(6).

Those credits are itemized and record-sourced in Appellant's Response and Objection to the Special Master's Report:

| Documented Credit / Transfer (Doc. 132, Part II) | Amount | Record Source |
|---|---:|---|
| AAPC preferred equity transferred to ULICO (Dec. 2022) | $352.9 million | Doc. 132 at 13 |
| Capital contributions to SNIC | $27.8 million | Doc. 132 at 15 |
| Cash payments to Pre-Designated Restitution Parties | $79.6 million | Doc. 132 at 16 |
| Cash payment to CBL (Beckett refinance amendment) | $3 million | Doc. 132 at 19 |
| Additional proceeds, sale of the Clanwilliam Group | $20 million | Doc. 132 at 19 |
| Real estate contributed to ULICO | $13.6 million | Doc. 132 at 20 |
| Sale proceeds of certain zero-coupon bonds | $243.4 million | Doc. 132 at 20 |
| **Total documented transfer credits** | **≈ $740.3 million** | **Doc. 132 at 11** |

3. The motion to dismiss presents five principal grounds. *First*, causation has never been adjudicated: the claimed losses were produced by the independent,

intervening acts of the state Rehabilitator — including the rejection of the Ares (November 2018) and Oaktree (February 2019) transactions, either of which would have monetized the affiliated-investment portfolio at face value and paid policyholders in full by mid-2019, together with pre-maturity bond sales and the extraction of professional fees — acts that no plea admission reaches and that break the chain of proximate causation the MVRA requires. See *Hughey v. United States*, 495 U.S. 411, 413 (1990); *Robers v. United States*, 572 U.S. 639 (2014); *Paroline v. United States*, 572 U.S. 434, 444–45 (2014). *Second*, the Preliminary Order is facially noncompliant with the MVRA: it exceeds the special master's own recommendation by $30 million (and now exceeds his final recommendation, since revised downward to $1,616,000,000, by $39 million), contains no itemization of victims' losses, no causation findings, and no findings under 18 U.S.C. § 3664(f)(2), yet was made due, payable, and enforceable immediately while acknowledged reductions remain unquantified. *Third*, the amount is subject to mandatory offsets under 18 U.S.C. § 3664(j)(2) of approximately $2.9 billion — including more than $1.2 billion in cash payments, asset transfers, and debt elimination already provided — yielding, on Appellant's figures, a net overpayment of approximately $1.2 billion. *Fourth*, the policyholders were paid in full in December 2025, fulfilling the MVRA's compensatory purpose. *Fifth*, because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), its amount may

be fixed only by the district court's de novo determination under § 3664(d)(6) — not by a special master's process the court has never reviewed.

4. The persons the underlying insurance proceedings exist to protect have been paid. On or about December 22, 2025, the policyholders of the insurance companies at the center of this case received distributions described in the estates' own notices as "the full amount of your claim in the liquidation" and "the final payment in settlement of any liability relative to your contract." Appellant's timing in seeking interim relief reflects that fact: he sought no stay of any kind while policyholder payments were being completed, precisely so that policyholders would be paid without delay or disruption. Only after those payments were complete — and the liquidation of assets nonetheless continued, without accounting and without credit — did Appellant move to stay the immediate-payment directive and the asset sales.

5. Within fourteen days of the Preliminary Order, Appellant moved to stay enforcement of the immediate-payment directive. (Doc. 172.) Appellant separately filed an emergency motion to stay all asset sales and asset-sale processes. (Doc. 190.) Both motions are fully briefed on Appellant's part and remain undecided.

6. The proceedings below offer no prospect of timely relief. The United States, rather than respond to the stay motions on the merits, sought and obtained an extension of time keyed to the resolution of prior defense counsel's motions to

22

withdraw — an event that has no bearing on the government's duty to respond under § 3664(e). (Doc. 205; text-only order of June 22, 2026.) The special master filed only an initial response (Doc. 217) and moved for an extension whose endpoint floats with the completion of his own final restitution recommendation, due on or before July 25, 2026 — approximately the same window in which, under 18 U.S.C. § 3664(d)(5), the final determination of the victims' losses must be made. (Doc. 218.) The practical effect of that sequencing is that the motions seeking to halt the asset sales would be answered, if at all, only after the restitution figure is finalized and the sales have proceeded. Appellant opposed both extensions on precisely that ground. (Docs. 211, 219, 220.)

7. The dissipation of restitution assets is not prospective; it has begun. Beckett — an operating company within Appellant's holdings — was transferred to the special master's control through an Assignment of Interests effective February 13, 2025, after the special master's appointment. It has since been sold to a third party. The special master neither sought nor obtained the district court's approval for that sale, and the sale left no trace on the district court's docket — no motion, no notice, no order; Appellant's counsel learned of it only orally, in or about December 2025. (Doc. 190-4 ¶ 5; Statement of Facts ¶ 11.) To this day the special master has provided no accounting of it, and no proceeds — and no part of the approximately

$134 million in value transferred to his control — have been credited against the restitution obligation.

8. The special master has also administered the distribution of $23,520,710 in proceeds from the sale of Clanwilliam Group — a primary restitution asset — to Vista, a party that, by the special master's own determination, is not a victim of the offenses of conviction: his report concluded that the related claimant "fall[s] short" of the victim definition because it had not "pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments," (Doc. 106-3, at 23), and the district court adopted that determination in the Preliminary Order of Restitution (Doc. 161) and Judgment (Doc. 162). Indeed, in the very filing proposing the distribution, the special master acknowledged he was unsure Vista was due restitution at all. (Doc. 66, ¶ 26 n.8.) Restitution-asset proceeds have thus been paid out to a recipient the restitution process itself has determined is not entitled to restitution. Appellant has moved to recoup that distribution and credit it against the restitution obligation. (Doc. 238) The recipient's related cell has since moved under the Crime Victims' Rights Act to overturn its exclusion (Docs. 221, 222) — and the special master, the very officer whose victim determination that motion attacks, has taken a position only within his own final report, recommending denial. That posture reflects a structural conflict: he cannot defend his own determination that the claimant is not a victim without confronting his own

24

administration of a $23,520,710 distribution to its affiliate on account of the same investments.

9. The dissipation is about to become total. On or about July 16, 2026, the special master indicated, on the parties' weekly call, that the assets held by NewHoldCo — which holds a substantial portion of the Primary Restitution Assets — would likewise be dissipated, even when there was final restitution amount set by the court de novo.

10. This course of conduct is systematic, not episodic. Under the Order Appointing Special Master, the special master exercises control over the restitution assets. (Doc. 56.) The appointing order itself conditions liquidation — twice — on "Court approval." (Doc. 56, at 6.) Notwithstanding that condition, that control, and 18 U.S.C. § 3664(d)(6)'s confinement of a special master to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court," the special master neither sought nor obtained the district court's approval for the Beckett sale, has provided no accounting of it or of any other disposition, and has identified no intention to seek approval before the dissipation of the assets held by NewHoldCo. And the administration has failed in both directions: where approval was not sought, a $134 million asset under the special master's control was sold without judicial authorization and without any record of the proceeds; where approval was obtained — the Clanwilliam proceeds — $23,520,710

flowed to a recipient the special master himself has since determined is not a victim. (Doc. 106-3, at 23.) Assets subject to a restitution order are being dissipated by a court-appointed officer, without the court's de novo determination of anything.

11. The process is accelerating even as these motions await answer — and it is proceeding out of order. As disclosed in Appellant's motion for leave to issue subpoenas and the correspondence appended to it (Doc. 248), the sale process now extends beyond NewHoldCo: ARM — an asset valued at approximately $[300] million — and Damovo are being marketed for sale, as reflected in the Rule 17(c) subpoena motion filed contemporaneously (Doc. 248). And AAPC — among the most valuable assets in the structure, with a current valuation of 18-to-20-times forecasted 2026 EBITDA of $150 million, i.e., approximately $2.7 to $3.0 billion, on the Houlihan Lokey analysis attached to the motion to dismiss (Doc. 234) is simultaneously being devalued: positioned for disposition at a fire-sale valuation, or for a write-down of its valuation, either of which would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1) before any restitution amount has been lawfully determined. The stated justification — that AAPC's debt is maturing and may drive the timeline — repeats the Clanwilliam playbook step for step: there too, a maturity-and-timing narrative was deployed to justify a rushed disposition after the arm's-length transaction had been blocked, and an asset that commanded $880 million at 22.14-times EBITDA under the Quadro agreement was

26

sold for a fraction of that figure. But maturing debt on a performing business is a refinancing event, not a forced-sale event — debt of this kind is routinely rolled over — and the record shows that when refinancing would have preserved value, the administration itself blocked it, as with the UKAT refinancing by BC Partners. The contrast is stark. The same administration that liquidates operating companies piecemeal — at the private-equity discounts the record already documents run some 63% below public-acquirer valuations — is writing down the very asset whose value demonstrates the estate's sufficiency to satisfy any award. Dispositions are proceeding before the determination that is their statutory predicate, outside any sequencing the appointing order contemplates, and without accounting at any step. Meanwhile, the pattern below has hardened: the United States has filed no merits response to either stay motion, obtaining instead an extension of time (Doc. 205); the special master has deferred his full response until after his final recommendation issues (Docs. 217, 218); and he addressed the Crime Victims' Rights Act motion attacking his own victim determination only within his own final report, recommending its denial rather than responding as an adversary (Docs. 221, 222). And as set forth in Defendant's emergency motion and supporting affidavit already of record below, government counsel demanded that defense counsel remove a protected filing from the public docket, stating that a failure to do so would be treated as a breach of the plea agreement — conduct Defendant has asked the district court

to address, in a motion that likewise remains unanswered. (Doc. 201; Aff., Doc. 201-1, ¶¶ 5–6.) A restitution determination cannot lawfully proceed to finality — and asset dispositions cannot lawfully proceed at all — while the dispositive motion to dismiss, the stay motions, and the pending challenge to the special master's own authority and neutrality (Doc. 190) remain unanswered.

12.  On July 22, 2026, the posture below hardened into a written record. The special master's counsel circulated a draft final supplement, a proposed final order of restitution, and an appendix to be filed under seal in its entirety, announcing that he would file by Friday, July 24 — although the governing period runs to July 29 — for the stated reason that he is "out of the office" and would "log in remotely." He demanded the defense position within one day, while Appellant sits in custody unable to review the documents and counsel who appeared that same day cannot meet him until the following Tuesday. It is from that same custody that the court has now ordered the Defendant produced for the August 7 hearing (Doc. 250), compelling him to face a substantive proceeding while imprisoned and without a fair opportunity to review the record, and while in transit through a BOP system where he will not have access to counsel en route before the hearing. Counsel will attempt to meet the Defendant on July 25, 2026, given the change in circumstances. Counsel invoked the joint bifurcation and requested an extension on the record; the special master's counsel answered that he would file notwithstanding; and the government,

asked directly for its position on the record, objected to any extension. (Ex. G (July 22, 2026 email chains).) That refusal to engage inverts the statute. Causation is the threshold determination of any restitution analysis: the government bears the burden of proving, by at least a preponderance of the evidence, that the claimed losses were directly and proximately caused by the offense conduct, 18 U.S.C. § 3664(e), including that intervening events did not sever the causal chain.[3] See *United States v. Stein*, 846 F.3d 1135, 1155–56 (11th Cir. 2017) (vacating a restitution award where the losses resulted from intervening, post-offense events not shown to have been reasonably foreseeable to the defendant). Answering the defendant's causation challenge is not a raid on the victims' recovery; it is the adjudication the statute makes the precondition of any recovery. And the MVRA itself supplies the answer for the case in which the government deems that adjudication too burdensome: for property offenses, where "determining complex issues of fact related to the cause or amount of the victim's losses" would unduly burden the process, the statute directs that mandatory restitution not be imposed at all. 18 U.S.C. § 3663A(c)(3)(B). Cost is a statutory ground for declining restitution; it is nowhere a license to impose —

---

[3] Appellant preserves the contention that because MVRA restitution is criminal punishment, *Ellingburg*, 607 U.S. at 166, the facts fixing its amount must be found by a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343 (2012). The showing here prevails under any standard.

still less to collect — restitution without the determination. The government's refusal is likewise irreconcilable with the accuracy the statute commands: restitution must issue "in the full amount of each victim's losses as determined by the court," 18 U.S.C. § 3664(f)(1)(A) — a determination that presupposes causation, not a figure finalized because answering the challenge to it was deemed too costly. Meanwhile, Appellant has been compelled to seek the underlying records themselves by Rule 17(c) subpoena requests directed to the Rehabilitator and the administration, filed contemporaneously in the district court (Doc. 248), because in the nearly eight years since he relinquished control they have never been produced to him. Appellant's evidence — that no loss was reasonably foreseeable when the affiliated investments were originated, and that intervening events after October 2018 severed any causal chain — is presented in the motion to dismiss (Docs. 234, 235) and stands undisputed.

13. Once those assets are sold, they cannot be recovered. Their disposition would liquidate the very res at issue before the amount, causation, offsets, and the special master's authority to direct such sales have been adjudicated by any court.

## ARGUMENT

### I.   This Court May Stay the Restitution Directive Pending Appeal.

Federal Rule of Criminal Procedure 38(e)(1) provides that, "[i]f the defendant appeals, the district court, or the court of appeals under Federal Rule of Appellate

Procedure 8, may stay — on any terms considered appropriate — any sentence providing for restitution under 18 U.S.C. § 3556." The rule vests this Court with express authority to stay the restitution directive on any terms it considers appropriate, and Rule 8 supplies the vehicle. That "any terms" authority permits the Court to condition the stay on preservation of the restitution assets, including by restraining their sale or dissipation pending the restitution determination. Rule 8 independently authorizes "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." Fed. R. App. P. 8(a)(1)(C); see also 18 U.S.C. § 3572(g) (restraint on transferring or dissipating assets where a monetary penalty is stayed); Fed. R. Crim. P. 38(e)(2) (orders to ensure compliance, including registry deposit or bond).

## II.    The Traditional Stay Factors Favor a Stay.

The familiar four factors govern: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The first two factors are the most critical. *Id.* at 434–35.

**Likelihood of success.** The restitution figure this motion asks the Court not to let be irreversibly collected is contested at its legal foundation, in two independent respects. Appellant need not prove the ultimate loss number to prevail on appeal; it is enough that the process fixing a $1.616 billion criminal figure is unlawful — a determination made by a non-Article III officer, before the § 3664(d)(6) de novo determination, on the summary premise that there are "no contested material factual issues … that require an evidentiary hearing" (Doc. 245-1, at 9). On that structural question Appellant is likely to succeed.

*First*, no court has adjudicated causation. The MVRA authorizes restitution only for losses to victims "directly and proximately harmed" by the offense of conviction. 18 U.S.C. § 3663A(a)(2); *Hughey v. United States*, 495 U.S. 411, 413 (1990) (restitution is authorized "only for the loss caused by the specific conduct that is the basis of the offense of conviction"). The Fourth Circuit has already articulated the governing standard in this very case: harm must be "closely related to the conduct inherent to the offense" rather than merely tangentially linked. (Doc. 203, at 4–5 (amended opinion in No. 26-1749).) Proximate cause under the restitution statutes is likewise explicated in terms of foreseeability and excludes losses attributable to independent intervening causes. See *Paroline v. United States*, 572 U.S. 434, 444–45 (2014); *United States v. Goodrich*, 12 F.4th 219, 228–29 (2d Cir. 2021) (government must prove, by a preponderance, that the harm was

foreseeable to the defendant in committing the offense). Here, the only foreseeability figure to which Appellant ever agreed is the Plea Agreement's stipulation that the loss known to or reasonably foreseeable by him exceeded $550,000,000 — a Guidelines stipulation the agreement itself distinguishes from restitution. (Plea Agreement (Doc. 40) ¶ 8(a).) The $1.655 billion Preliminary Order is occupied by losses Appellant contends were caused by independent intervening acts of the state Rehabilitator — blocked sale transactions, pre-maturity bond sales, and the extraction of fees — that no plea admission reaches and no court has adjudicated. The district court's own observation at sentencing was that "the real loss there was risk." (Sent. Tr. at 47:21-22.) Indeed, the court explained that "[t]he fact that all of it wasn't lost … only means that the loss was overstated." (Sent. Tr. at 47:18–21.) Appellant's motion to dismiss the $1.655 billion restitution figure (Doc. 234) presents this causation challenge in full (see note 3, supra): there was no proximate causation to begin with, because the losses claimed were neither known to nor reasonably foreseeable by Appellant at the time the investments were originated, and were produced by intervening acts of others. The motion develops the point in two steps. As a matter of the plea agreement's text, the restitution provision reaches persons "directly or indirectly harmed by [Appellant's] criminal conduct" (Plea Agreement (Doc. 40) ¶ 10(a)); its phrase "regardless of the resulting loss amount" addresses quantum, not causation, and neither dispenses — nor could dispense —

33

with the MVRA's requirement that the loss be caused by the offense conduct. Paragraph 10(a) of the plea agreement itself provides for restitution only for harm "caused by the defendant's criminal conduct." (Doc. 40 ¶ 10(a); Doc. 234 at 11.) And as a matter of causation doctrine, the intervening acts here are of a different order than the victim-choice scenarios that mark proximate cause's outer limits: the Rehabilitator did not merely hold collateral while its value declined, cf. *Robers*, 572 U.S. at 645–46; he refused face-value cash transactions — Ares in November 2018 and Oaktree in February 2019, either of which would have monetized the portfolio in full and paid every policyholder by mid-2019 — sold bonds before maturity, and extracted professional fees from the very estates said to have suffered the loss. Each was an independent, discretionary act of a third party; none was admitted in the plea; none has been adjudicated by any court. (Doc. 234 at 9–16.) Whether plea admissions can, as a matter of law, establish proximate causation for the full $1.655 billion is a question of legal sufficiency committed to the district court's de novo determination, 18 U.S.C. § 3664(d)(6) — a determination that has not occurred.

*Second*, the amount is subject to offsets the statute makes mandatory. Any restitution award "shall be reduced" by amounts later recovered for the same loss. 18 U.S.C. § 3664(j)(2). Appellant's pending filings document offsets and credits of

34

approximately $2.9 billion against the $1.655 billion figure[4] — including more than

$1.2 billion in cash payments, asset transfers, and debt elimination already provided,

and, concretely, the approximately $134 million in Beckett value transferred to the

special master's control by Assignment of Interests, no part of which has been

credited. The statute's command presupposes an accounting. Restitution exists to

---

[4] The offsets and credits are itemized in Defendant's Response and Objection to the Special Master's Report (Doc. 132) and the reconciliation exhibits thereto, and include, among others:

| Offset / Credit | Amount |
|---|---:|
| Starting-balance correction to the Special Master's report | $188,000,000 |
| NCIC enterprise value at the October 2018 transfer of control | $478,000,000 |
| Clanwilliam sale distributions ($172,171,598 NCICs; $80,993,997 ULICO; $23,520,710 Vista) | $276,686,305 |
| AAPC preferred equity (current par value) | $358,000,000 |
| AAPC preferred dividend payoffs | $38,000,000 |
| Beckett sale proceeds, uncredited (price, not conceded value) | $134,000,000 |
| Agera Energy credit | $102,000,000 |
| ECL credit | $118,000,000 |
| Holding-company debt elimination | $50,000,000 |
| UKAT refinancing loss (blocked BC Partners refinancing) | $39,000,000 |
| SNIC escrow | $28,000,000 |
| Non-IALA assets | $59,000,000 |
| Clanwilliam fire-sale loss relative to the Quadro valuation | $474,000,000 |
| Real-estate sale proceeds retained without credit | $25,000,000 |

compensate — to restore victims to their position before the loss, see *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) — and awards must be reduced by amounts recovered precisely so that no victim obtains a windfall. *Robers*, 572 U.S. at 644. An obligation that "shall be reduced" by recoveries cannot be lawfully administered without a running account of what has been recovered, from whom, and for whose benefit — yet the officer administering this one has provided no accounting of anything. On Appellant's figures, he has already overpaid any properly calculated obligation. The net figure, once causation and offsets are properly adjudicated, may be a fraction of the Preliminary Order — or zero. A restitution directive whose amount could move by that magnitude cannot support immediate, irreversible collection.

*Third*, the process generating the figure itself is contested. A special master may be referred restitution issues only "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). Here, the special master is proceeding to a final restitution recommendation — and to the liquidation of the assets themselves — without the district court's de novo determination of causation or the pending offset motions, and Appellant has challenged that exercise of authority on Article III grounds. Because restitution under the MVRA "is plainly criminal punishment," *Ellingburg v. United States*, 607 U.S. 163, 166 (2026), fixing its amount is a judicial

36

function that § 3664(d)(6) reserves to the court. The stay motions below develop the point with controlling authority: § 3664(e) commands that any dispute as to the amount "shall be resolved by the court," an allocation the Fourth Circuit enforces strictly, *United States v. Johnson*, 48 F.3d 806, 808–09 (4th Cir. 1995); the judicial power may be exercised only by Article III courts, *Stern v. Marshall*, 564 U.S. 462, 484 (2011); and consent cannot cure a structural defect in the allocation of that power, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850–51 (1986). (Doc. 190, at 13–17.) Appellant's motions attached herewith show docketing statement challenges, among other things, whether the restitution determination is procedurally and substantively proper where final restitution adjustments were reserved to a post-sentencing special-master proceeding that remains pending — and the Article III, sequencing, and the like, *supra*. The departure from the advisory role is not abstract: the special master exercises control over the restitution assets under the appointing order (Doc. 56), yet has disposed of them — beginning with the approximately $134 million Beckett transaction — without seeking the district court's approval for that sale and without providing any accounting; and he has administered a $23,520,710 distribution of restitution-asset proceeds to a recipient he himself has since determined is not a victim (Doc. 106-3, at 23), a determination now under attack in a Crime Victims' Rights Act motion (Docs. 221, 222) to which he — the officer charged with victim identification — has now taken a position only

37

within his own final report. An officer limited by statute to proposing findings for the court's de novo determination is instead liquidating and distributing the estate on his own authority and is conflicted from defending even his own recommendations. Appellant is likely to show that a restitution amount fixed through that process cannot stand — and, at a minimum, that the amount will be materially reduced once causation and offsets are properly adjudicated.

Nor is the adversarial, criminal character of these proceedings merely Appellant's characterization — the government has declined to dispute it. Appellant's motion concerning access to counsel and case records for the restitution proceedings — a motion premised expressly on the propositions that the restitution determination is part of the criminal sentence, constitutes criminal punishment under *Ellingburg*, and is a stage of the criminal case at which due process and counsel rights attach — was filed on the district court's public docket, not ex parte, with notice to the United States and responses due by July 1, 2026, and drew no opposition. (Doc. 225, at 2, 6.) Having declined below to dispute that the restitution determination is adversarial criminal punishment to which due process attaches, the government cannot now countenance the liquidation of the res before any adversarial adjudication of causation, offsets, or amount has occurred. Due process in a criminal punishment proceeding means, at a minimum, that the punishment is fixed before it is executed.

And the Article III sequencing violation, once executed, is not fixable. De novo review under § 3664(d)(6) can revisit a recommendation; it cannot unsell Beckett, recall the $23,520,710 distributed to a non-victim, restore the fees already consumed, or reconstruct the value destroyed in a fire sale. Each disposition converts a correctable legal error into a permanent fact. That irreversibility is the reason this motion is necessary: because the violations already executed cannot be remedied retroactively, the only remedy that still exists is prospective — a stay of further sales pending appeal, so that the sequence the Constitution and the statute require (adjudication first, execution second) is preserved for what remains of the estate. A stay is not one available remedy among several; for the assets not yet sold, it is the only one. And the next execution is already in motion: a disposition of AAPC on the Clanwilliam model — at the documented 63 percent private-acquirer discount from its $2.7-to-$3.0 billion valuation — would erase on the order of $1.7 billion or more in a single transaction, a sum exceeding the entire Preliminary Order, and would moot the adjudication this motion exists to preserve. Without a stay now, the questions presented below and in the consolidated appeals will be answered by a sale rather than by a court.

Fourth, the proposed order would resolve all of this with no hearing at all. It asks the district court to find, "viewing the facts in a light most favorable to Defendant," that there are "no contested material factual issues … that require an

evidentiary hearing." (Doc. 245-1, at 9.) The order presses for entry with no hearing at all, moreover, while the very motions contesting the award remain unanswered by the Government on the docket — asking the court to deny them by adoption rather than adjudication. That is a civil summary-judgment standard imported into criminal restitution, and it collides with the statute: § 3664(e) commits any dispute "as to the proper amount or type of restitution" to resolution "by the court by the preponderance of the evidence," and § 3664(d)(6) requires the court's de novo determination — neither of which a paper finding of "no genuine issue" can supply. The burden is the Government's. *United States v. Ritchie,* 858 F.3d 201, 211 (4th Cir. 2017); 18 U.S.C. § 3664(e). On the parties' weekly call with the Special Master, the Government stated that responding on the merits to the causation arguments would take money from the victims, and that the Special Master — not the Government — must respond: an open refusal to carry that burden, and an improper reliance on the neutral's recommendation as though it were the Government's proof. Yet the Government has filed no merits response to any pending motion, and Appellant — who bears the burden on offsets, *United States v. Karam,* 201 F.3d 320, 329 (4th Cir. 2000) — has been denied the very records needed to carry it. A defendant cannot be put to a burden at a hearing that never occurs, on documents he is not permitted to obtain; and a special master's report is not the Government's opposition — only the court may resolve a dispute as to the proper amount of

restitution. *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir. 1995). That the recommended figure fell from $1.655 billion to $1,616,000,000 once the defense's objections were tested confirms the dispute is real, not illusory. The order resolves everything by adoption — it adopts the master's findings "as the Court's own" (Doc. 245-1, at 5), finds "Defendant has failed to rebut" the recommendations (Doc. 245-1, at 8), and, upon entry, makes restitution "due and payable immediately" and enforceable as a judgment, with an abstract available on request (Doc. 245-1, at 12): judgment-grade collection against a res already being liquidated.

Nor is the answer to convene a hearing now. Appellant does not resist a hearing — § 3664(e) entitles him to one — but any hearing is premature until the Government files merits responses to all six pending motions (and any additional motions subsequently filed) and the district court resolves the challenge to the special master's authority and neutrality (Doc. 190). A hearing staged on a conflicted officer's report, before the adversary that bears the burden has stated its position, would ratify the report rather than test it, and would resolve nothing the statute commits to the court on an adversarial record. Counsel said as much when the Preliminary Order was entered: it was "obviously subject to the objections of numerous parties and further hearings with the Court." (Sent. Tr. at 66:20–22.) The district court's own bifurcation order says the same: it anticipated that "the restitution issues in this case may require a lengthy hearing or hearings," and ordered

41

that "the Court will schedule one or more hearings (if necessary) to finalize restitution." (Doc. 108, at 2, 4.)

The Government's contrary authority does not carry the day. Section 3664 does not make an evidentiary hearing mandatory in every case, *United States v. Ziadeh*, 104 F. App'x 869, 874 (4th Cir. 2004); but *Ziadeh* upheld a denial only where the defendant offered a "bald assertion," *id.* at 875 — the opposite of the specific, material disputes developed in the motion to dismiss here. Nor is the burden the Government's to escape: it "never shifted" as to the amount of loss, *United States v. Steele*, 897 F.3d 606, 613–14 (4th Cir. 2018), and even the allocation of the offset burden is contested — the Ninth Circuit commits it to the court's "as justice requires" determination "in its entirety." *United States v. Crawford*, 169 F.3d 590, 592–93 (9th Cir. 1999).

**Irreparable injury.** The injury here is not hypothetical, prospective, or monetary in the ordinary sense. It is the ongoing, irreversible liquidation of the res. One operating company — transferred to the special master's control by Assignment of Interests — has already been sold for approximately $134 million, without court approval and without credit. $23,520,710 in sale proceeds has already been distributed to a recipient the special master himself has determined is not a victim. (Doc. 106-3, at 23.) And on or about July 1, 2026, the special master indicated, on the parties' weekly call, that the assets held by NewHoldCo — a substantial portion

42

of the Primary Restitution Assets — would likewise be dissipated, before any final restitution amount is determined. The harm is compounded by the absence of any accounting: because the special master has accounted for none of the dispositions, neither Appellant nor any court can even measure the dissipation as it occurs — what has been sold, for how much, or where the proceeds have gone. And the acceleration now disclosed compounds it further: a fire-sale disposition or write-down of AAPC would not merely diminish the res — it would trigger forfeiture consequences under the plea agreement (Doc. 160, ¶ 1), converting an unadjudicated restitution figure into a completed taking that no subsequent ruling could undo. Nor is sale the only mode of destruction. Since taking control in October 2024, the administration has shut down operating Specified Affiliated Companies outright — including the Riversource group, companies with millions of dollars in revenue and decades of operating history — notwithstanding the stipulation in the Clanwilliam sale order that the de minimis companies hold no value for the restitution process. A stay of sales alone cannot prevent shutdowns — which is why the observer and accounting terms requested below are necessary complements to the stay. The information asymmetry is equally complete: the records of the estate's own realized losses have been in the exclusive control of the Rehabilitator and the administration since Appellant relinquished control in October 2018; Appellant, incarcerated, has never possessed them. Only an accounting can produce them. Once sold, those assets

43

cannot be restored; funds disbursed are, as a practical matter, unrecoverable if the amount is later reduced or the process by which it was set is invalidated. No later ruling in Appellant's favor — in the district court or in this Court — could undo those sales. And because the district court has not acted on either stay motion, and the special master has sought to defer his response until after the final report triggering a final order and sales are complete, only a stay from this Court, entered now, can preserve the status quo.

Nor does the pendency of Appellant's merits motions below counsel delay of the issuance of the requested stay. Those motions seek different relief — the adjudication of causation, offsets, and the amount — that this motion expressly leaves to the district court. What the district court has twice been asked for, and has not provided, is interim preservation of the assets. The pendency of the motion to dismiss is itself a reason for the stay, not against it: that motion is dispositive — if granted, it eliminates the restitution obligation entirely — and a stay is the only means of ensuring that the res is not liquidated before it is decided. Enforcement should not outrun adjudication. The pendency of the merits motions thus confirms, rather than undermines, the need for a stay: they demonstrate that the amount remains fundamentally contested while the res that would satisfy it is being liquidated.

44

The same logic supports staying the issuance of the final restitution recommendation itself. The restitution phase exists as a separate, deferred proceeding by design: the district court bifurcated sentencing from the restitution determination and deferred the amount under 18 U.S.C. § 3664(d)(5) — a structure adopted with the parties' agreement — precisely so that the amount would be fixed through orderly adjudication rather than at the sentencing hearing. (Doc. 107). That structure was not an accident of scheduling: before sentencing, the parties jointly moved to bifurcate sentencing from the restitution determination (Doc. 107, granted, Doc. 108), and the court proceeded on precisely the structure the parties jointly proposed — imposing sentence on May 26, 2026, entering the Preliminary Order two days later, and deferring the final restitution determination under 18 U.S.C. § 3664(d)(5). Having jointly proposed that architecture and received the completed sentence it contemplated, the government cannot now collapse the adjudicative phase that was its other half. The sentence the government received was itself a downward variance the court granted "due to the extraordinary cooperation of Mr. Lindberg." (Sent. Tr. at 62:6–8.) Doc. 107, Defendant Greg E. Lindberg and the United States' Joint Motion to Bifurcate Sentencing Hearing, filed April 3, 2026 at 5-6.   The current schedule inverts that structure. The special master's final recommendation is due July 25, 2026 — before the district court has resolved the dispositive motion to dismiss (Docs. 234, 235), the stay motions (Docs. 172, 190),

or the challenge to the special master's own authority and neutrality (Doc. 190), and before the special master even responds to those motions (Docs. 217, 218). A final figure produced on that sequence would be fixed by a non-Article III officer in advance of every Article III determination the statute reserves to the court. And no urgency justifies the rush: the sequencing defect already exists, and it cannot be cured by accelerating the report — while the harms of acceleration — liquidation, forfeiture triggers, and unreviewable distributions — are the subject of this motion. Completing motions practice first costs nothing; rushing the report costs everything this motion seeks to preserve. The Court should hold the process to the bifurcated structure the district court itself adopted. The report has now issued: the special master filed it on July 23, 2026 — ahead of even his announced Friday date, and before the end-of-day time by which his counsel had stated, in writing, that he would await Mr. Lindberg's comments. (Ex. G (email of the special master's counsel).) The report was filed within hours after counsel provided Rule 27(e) notice of the present filings to the government's appellate counsel — notice given at 9:01 a.m.; filing confirmed by the government's appellate counsel at 11:12 a.m. (Ex. G (email timestamps).) Nothing in this motion is mooted: the report is a recommendation without legal force until the district court acts on it, 18 U.S.C. § 3664(d)(6), and the harms this motion addresses — the asset sales and the immediate-payment directive — remain fully subject to the relief requested.

46

**No substantial injury to others.** A stay of the immediate-payment directive does not impair any victim's ultimate recovery. The obligation remains in place, and the eventual award is already secured by approximately $6 billion in collateral value under the court's control — Appellant's assets, held under the special master's administration pursuant to the appointing order — the Specified Affiliated Companies through NewHoldCo, and AAPC separately. (Doc. 56.) Because the amount is itself still being determined, immediate collection is premature, not delayed. Nor can Appellant's timing be held against him: he forbore from seeking any stay while policyholder payments were being completed, and moved within fourteen days of the Preliminary Order once it issued. Victims are harmed, not helped, by distributions that may have to be clawed back — or that flow, as $23,520,710 already has, to a recipient the restitution process itself has determined is not a victim.

**Public interest.** The public interest lies in restitution that is accurately and lawfully determined, not rapidly collected and later unwound — and the compensatory urgency that might otherwise weigh against a stay is absent here. The policyholders whom the underlying insurance proceedings exist to protect have been paid in full. As set forth in the sworn Statement of Facts of record below, approximately 43,000 individual policyholders received distributions in December 2025 totaling approximately $157 million — payments described in the estates' own

47

notices as "the full amount of your claim in the liquidation" and as "the final payment in settlement of any liability relative to your contract" — and the special master himself filed a Notice of Distribution confirming those payments on December 23, 2025. (Statement of Facts (Doc. 190-4) ¶¶ 13; Ex. B7.) Appellant's own conduct honored that priority — he sought no stay while those payments were being completed, precisely so that policyholders would be paid without delay. With the policyholders paid, continued liquidation of the estate serves no one so directly as the administration itself: the professional fees of the administrators, advisors, and liquidators have already consumed approximately $175 million.

## III. The Court's Existing Control of Appellant's Assets Provides Complete Security.

No bond or further security is required, because Appellant has already provided it. Pursuant to his plea commitments, Appellant transferred the majority of his assets to the control of the court: through the Assignment of Interests effective February 13, 2025 and related instruments, interests in more than 300 companies — including the operating companies held by NewHoldCo, comprising approximately $6 billion in collateral value — were placed under the special master's administration pursuant to the appointing order. (Doc. 56.) The value of that collateral is demonstrated, not asserted. Applying the 22.14-times EBITDA multiple established by the arm's-length Quadro transaction to forecasted 2026 EBITDA of

48

approximately $300 million yields a value exceeding $6 billion for the remaining operating companies; and the Quadro transaction itself — which covered only a subset of the assets and did not include AAPC — was valued at $3.4 billion. (Docs. 132, Exhibit 1 - Part 2.)  On either measure, the collateral under the court's control is worth several billion dollars if it is preserved and sold at arm's length — several multiples of the $1.655 billion Preliminary Order, and well in excess of any potential restitution determination, which on Appellant's showing of causation and offsets is zero. That value, however, is not a static cushion: it exists only so long as the assets are not liquidated at a fraction of their worth, and the stay is what preserves it. Absent a stay, the fire-sale dispositions documented above convert billions in security into a fraction of the award — the very irreparable harm this motion seeks to prevent. No asset can leave the estate except through the court's own officer, and a stay restraining dissipation preserves — rather than diminishes — the fund from which any award would be paid. A defendant who has already delivered the res into the court's hands has provided greater security than any bond could; what remains is only to ensure that the res is still there when the amount is finally and lawfully fixed.

## CONCLUSION

Appellant respectfully requests that the Court (1) enter an administrative stay of the immediate-payment directive pending disposition of this motion; (2) stay, pending appeal, the directive that restitution be paid immediately, together with any

49

materially identical immediate-payment directive in any subsequent or final restitution order; and (3) as a term of that stay, restrain the sale or other dissipation of all assets subject to the restitution order — including the assets held by NewHoldCo, assets held in trust, and any dissipation by way of forfeiture — until the district court has determined causation, the pending offset motions, and the final amount of restitution, on such conditions securing the obligation as the Court deems appropriate; and (4) direct that the special master account for all dispositions to date; that a representative of Appellant be permitted to sit on the boards of all Primary Restitution Assets and Specified Affiliated Companies to prevent their wind-down, closure, or dissolution pending the district court's determination of causation, the pending offset motions, and the final amount of restitution; and that any asset the district court finds is being mismanaged be returned to Appellant's ownership and control. (Court approval for any disposition is not separately requested only because the appointing order already requires it. (Doc. 56, at 6.)) The determination of causation, offsets, and the final amount of restitution should proceed in the district court, subject to that court's de novo determination under 18 U.S.C. § 3664(d)(6).

Respectfully submitted,

/s/ Vivek Ramachandran

50

Vivek Ramachandran
DHAMMA LAW PLLC
418 Broadway, Suite N
Albany, NY 12207
(202) 860 - 4084
vramachandran@dhammalaw.com
*Counsel for Defendant-Appellant,*
*Greg E. Lindberg*

## CERTIFICATE OF COMPLIANCE

This motion does not comply with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 11, 213 words. Accordingly, Appellant is filing concurrently herewith a Motion For Leave To File Emergency Motion In Excess of The Type-Volume Limitation.

It complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) – (6) because it has been prepared in a proportionally spaced typeface using a word-processing system in 14-point Times New Roman.

/s/ Vivek Ramachandran
Vivek Ramachandran

## CERTIFICATE OF SERVICE

I certify that on July 24, 2026, I electronically filed the foregoing with the

Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF

system, which will serve all counsel of record as follows:

Anthony Joseph Enright, Assistant U. S. Attorney
Email: usancw.appeals@usdoj.gov
Office of The United States Attorney
Western District of North Carolina
Suite 1650
227 West Trade Street
Charlotte, NC 28202

Jeremy Raymond Sanders
Email: jeremy.sanders@usdoj.gov
U.S. Department of Justice
Criminal Division
1400 New York Avenue, NW
Washington, DC 20005

*Counsel for Plaintiff-Appellee,* United States of America

/s/ Vivek Ramachandran
Vivek Ramachandran