No. 26-4309

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,
v.
GREG E. LINDBERG,
Defendant-Appellant.

---

On Appeal from the United States District Court
for the Western District of North Carolina
No. 3:23-cr-00048-MOC-DCK-1 (Hon. Max O. Cogburn, Jr.)

---

# SECOND MOTION FOR AN EXTENSION OF TIME TO FILE APPELLANT'S OPENING BRIEF

Defendant-Appellant Greg E. Lindberg respectfully moves under Fed. R. App. P. 26(b) and Fourth Circuit Local Rule 31(c) for a further extension of thirty-one days, to and including November 29, 2026, within which to file his opening brief. The brief is presently due October 29, 2026 under this Court's order of September 23, 2026, which granted Appellant's first, unopposed request for a thirty-day extension. **The United States has no objection to a request for extension of time.**

**In support of this Motion, and to keep the Court apprised of the issues why this briefing should wait until the final order of restitution is filed, Appellant alone states as follows:**

1. Whether the retrial complied with this Court's mandate in the prior appeal, *United States v. Lindberg*, 39 F.4th 151 (4th Cir. 2022), is the subject of the post-trial motions, No. 5:19-cr-22, Docs. 440, 441, whose restoration Appellant has preserved for this appeal. Doc. 368, Part III.E. Final restitution still has not been ordered in the district court; no amended judgment fixing the amount has been entered; and the motions bearing on that determination are fully briefed and await decision. Since the first extension was granted, the district court accepted Appellant's supplemental filings on those motions by order of October 6, 2026, No. 3:23-cr-48, Doc. 361; the United States and the Special Master responded on October 13, 2026, Docs. 366, 367; and Appellant replied on October 15, 2026, Docs. 368, 369.

**The prior appeal and the retrial**

2. The retrial in No. 5:19-cr-22 is where the pending issues begin, and they begin with the jury instructions. This Court had held that whether there was an "official act" is for the jury and that the "business"

under § 666(a)(2) is "the business of the entity on whose behalf the agent is authorized to act," not the agent's own. *Lindberg*, 39 F.4th at 159–65, 174. On retrial the district court declined to instruct the jury that it could not convict on the reassignment of tasks—a request for a different regulator—as an "official act," and it told the jury that as to "both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful," contradicting its own instruction that "corruptly" requires "knowledge that the conduct was unlawful" and reproducing the cross-count "infection" this Court had found the first time. No. 5:19-cr-22, Doc. 441 at 18–20, 25–26 (citing *Lindberg*, 39 F.4th at 164–65). The district court acknowledged that the jury could have gone "either way." *Id.* at 26. Those are the post-trial motions whose restoration Appellant has preserved. The Government's rebuttal argument is a further pending issue. The Public Integrity Section trial attorney who tried the case, William Gullotta, opened the Government's rebuttal by telling the jury, "I did not expect to walk into the closings to see drugs and money strewn about the courtroom, certainly not by defense counsel," and called the case "bribery, plain and simple," Doc. 368 at 52 n.5 (quoting Trial Tr., No. 5:19-cr-22, Doc. 450 at

974–75); and the Government made two heavily redacted e-mails "the capstone of its rebuttal argument," suggesting—falsely—that Appellant had resent an e-mail to himself "after deleting 'the quo,'" timed "for maximum effect—at the end of the government's rebuttal argument, depriving the defense of any opportunity to respond." Doc. 441 at 47, 52–53. Mr. Gullotta appeared on the Government's brief in *United States v. Mackey*, 143 F.4th 129 (2d Cir. 2025), where the Second Circuit reversed the conviction with instructions to acquit, and the Section he served in has since been hollowed out—"about 30 prosecutors" reduced so that "as few as five lawyers may remain," with its cases "transferred to U.S. attorney's offices around the country." Doc. 368 at 52 n.5 (citing *Mackey* and Alanna Durkin Richer & Eric Tucker, *Justice Department Is Expected to Slash Public Corruption Unit, AP Sources Say*, Associated Press (Mar. 11, 2025)). The same office now asks the district court to accept its account of the Special Master's communications, and of a report it edited ex parte, without producing either. Appellant has no interest in delay; it is the Government that will not develop the record or share the data, and the prejudice is Appellant's.

**The Government's ex parte communications and the Special Master's ex parte communications**

3. The record at the district court is extraordinary. Unlike a normal criminal proceeding, in which the Government develops the record, the record below is being developed largely by Appellant, over the Government's active opposition: the Government has produced very little, if anything, Doc. 341 at 15, and its latest filing asks the district court to "put appropriate limits on any future filings" by Appellant, Doc. 367 at 5—a request made just as the extent of the ex parte communications, and of the Government's editing of the Special Master's report in the absence of defense counsel, was being placed on the record. Docs. 356, 365. The pending motions go to the record itself. The Special Master's own fee applications record 762 entries and up to 569.8 billed hours of communications with third parties in which no defense counsel took part, Doc. 365 at 11, and more than 150 contacts between the Government and the Special Master's team before sentencing, none with defense counsel present; Appellant still does not know what was said in any of them. Doc. 356 at 3; Doc. 365 at 9. The Government's own ex parte communications with the victims' representatives, custodians, and claimants are known only from the Special Master's reports; the

Government has refused to produce their content or the data behind them. Doc. 368 at 47–48; Docs. 331, 332, 356. Any contact the Government had outside the Special Master's presence is entirely unknown and unknowable: the Government has disclosed none of it, and there are no billing entries from which to reconstruct it. Doc. 365 at 12. Those communications are the subject of Appellant's pending motion, as supplemented, to remove the Special Master and to disqualify the Government attorneys who took part in them. Doc. 347; Doc. 356 at 54; Doc. 361.

4. The ex parte communications themselves are not in dispute. The Special Master admits the practice—communications "outside the presence of both the government and Defendant's counsel with third parties on a daily (or near daily) basis," Doc. 343 ¶ 9; *see* Doc. 288 at 10—and admits that he has not turned over the documents. Doc. 343 ¶ 24; Doc. 365 at 3, 6. The order appointing him contains no provision for ex parte communications: it directs him to "regularly update the Parties" and to "consult with the Parties." Doc. 56 ¶ 5; *see* Doc. 332 at 12. At the very least, those communications breach the order's requirement that the Special Master keep both Parties informed. Only one party is being

informed—the Government. Appellant is entirely blind. Doc. 332 at 8. The order's both-Parties language tracks the MVRA itself, which requires disclosure "to both the defendant and the attorney for the Government" of "all portions" of any report pertaining to restitution. 18 U.S.C. § 3664(b); Doc. 368 at 47. Under paragraph 8 the Special Master may require Appellant, through counsel and in writing, to provide information or to take "all necessary steps identified by the Special Master," Doc. 56 ¶ 8, because Appellant surrendered the restitution assets to a Special Master who also functions as their receiver—an appointment Appellant contends is unconstitutional, Doc. 347 at 18, 39. Appellant's counsel have complied with such requests repeatedly—furnishing, at the Special Master's request, financial, credit, and repayment data to him and his financial advisor, as the Government's own filing records, Doc. 341 at 7–8 (quoting Doc. 75-1)—and that data went to the Government as well. Doc. 332-2 at 103; Doc. 341 at 4 (quoting Doc. 65 at 4). The Government, for its part, will not turn over any of its own communications—none of which the order authorizes—yet it wields as a sword the one kind of ex parte communication the order does authorize: paragraph 8 requests initiated by the Special Master, including the July 31, 2026 request that

Appellant sign AAPC's tax returns, which current counsel himself forwarded to the Government the morning after learning it had not been copied. Doc. 341 at 5–11; Doc. 367 at 3–4; Doc. 368 at 41–45. The comparison answers itself. Appellant has higher standards than the Government.

5. The withholding extends to substantial portions of the restitution record. The ex parte communications between the Government and the Special Master ran for eighteen months—from February 2025 through June 2026, and by his counsel's sworn account continuing "on a daily (or near daily) basis"—and reached every aspect of the proceeding: the Special Master's own role, the victims, the loss, the assets, his report, his status presentations to the court, and the sentencing. Doc. 356 at 44 (citing Doc. 343 ¶ 9). They include the Government's meetings with the guaranty associations together with the Special Master's team on July 21 and October 15, 2025, with no defense counsel named. Doc. 365 at 13 (citing Doc. 81 at 26, 66; Doc. 95 at 15, 38). And the Special Master's own billing entries, filed with the district court, record the Government drafting and editing the final report in the absence of defense counsel: a conference with AUSAs Dan Ryan and

Bain-Creed "re special master's report" (February 23, 2026); the Special Master's review of "comments to draft restitution report and redline of proposed order from DOJ" (March 16); a call with AUSA Dan Ryan "re specific language in various parts of the restitution report and appendices" and e-mails "re futher [sic] edits to draft report from the government," two days before the report was filed (April 1); and a video conference with the Government and the financial advisor "re preparation of final supplement to restitution report" (June 25). Doc. 148 at 30, 37, 43; Doc. 263 at 22; Doc. 368 at 6–7. Those entries are admitted on the record. None of it has been disclosed to Appellant, even today. And neither the Special Master nor the Government has accounted for billions of dollars in restitution assets as the MVRA requires. 18 U.S.C. § 3664(a); Doc. 281 at 39–43. The pending motions seek all of it—the data underlying the restitution figure, every ex parte communication of the Special Master and the Government, and the accounting the MVRA requires—together with the removal and disqualification relief described above, Docs. 281, 331, 332, 347, 356, and the district court's rulings on them will fix what the record on appeal contains.

6. More disturbingly, and by way of example only, this Court has already decided one matter on that one-sided record. Conservatrix's mandamus petition, *In re Zetteler*, No. 26-1749, was filed on June 11, 2026 with a 278-page appendix and no district-court motion; Appellant had about twelve hours to respond; 72.5 of the 85.1 hours the Special Master's team billed on Conservatrix—none of it shared with the defense—had already been billed when the petition was filed; and the panel recited that "the Special Master spoke with Petitioners' counsel multiple times and reviewed information submitted by Petitioners," slip op. at 3, without being told that none of it had been disclosed to Appellant. Doc. 365 at 1–2, 5–7.

7. The Government, for its part, has built little record of its own. It has produced very little, if anything. Many of the motions filed below it has not answered at all; its practice "has been to leave Defendant's motions unanswered and later to describe the issues they raise as waived," Doc. 347 at 43, and the record on those motions is being developed by no one but Appellant. It has still not disclosed a single ex parte communication or what any of them contained—which Appellant contends is Brady and Giglio material, because the communications are

the Government's own "edits" to the report offered as proof of loss and bear on the credibility of those who prepared it. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972); Doc. 368 at 47; Doc. 332 at 15. Appellant has been denied access to virtually all of it, and few, if any, of the pending motions are likely to yield it. The district court denied his motions to set aside the reference and remove the Special Master, Doc. 330, and denied his subpoena requests, Doc. 304, on an opposition the Government, claiming no interest in the third parties' records, had no standing to make. Doc. 309 at 13–14. The Special Master will not produce his communications, the data underlying the restitution report, or the accounting the MVRA requires, Doc. 343 ¶ 24; Doc. 365 at 3, 6; 18 U.S.C. § 3664(a); Doc. 281 at 39–43—not even under the standing protective order that governs the Government's discovery in this case, under which the Government produced its own FBI interview memoranda (Forms FD-302) of its 2018 and 2019 meetings with Ares Management, Doc. 321 at 1–2; Doc. 356-1 at 129. Doc. 309 at 7–8. And by the Special Master's own account, none of the ex parte communications can now be reconstructed, because no one kept track of them: his counsel swears that he has communicated "[w]ithout having tallied each and

every phone call, email, video conference, or the amount of time spent on each." Doc. 343 ¶¶ 9–10; Doc. 346 at 44–45. Its answer to the motion to compel is that Appellant already has what he needs, Doc. 341 at 15; its answer on causation—Appellant's showing that "the asset sales and transfers the Special Master isolates as loss-causing conduct followed from, and were the product of, the Government's own intervention," Doc. 321 at 1–2; Doc. 281 at 20–24; Doc. 356-1 at 128–29—is two pages of generalities, Doc. 308 at 19–20, and a footnote, Doc. 353 at 1 n.1, neither of which engages that evidence; its answer to a 65-page motion for reconsideration is two pages saying that "the record … speaks now for itself," Doc. 353 at 1–2; and its answer to Appellant's updates is six pages asking the court to "rule on the outstanding motions and bring this matter to a conclusion." Doc. 367 at 5. Appellant therefore has no interest in delay; these issues are urgent to him. It is the Government that is unwilling to develop the record or share the data, and that unwillingness prejudices Appellant. But he cannot bring these issues before this Court without a complete record.

**The sentence**

8. The Special Master has no input into the sentence under the MVRA. His reference under § 3664(d)(6) was limited to proposed findings on restitution, subject to de novo determination; he had no role in determining Appellant's custodial sentence. 18 U.S.C. § 3664(d)(6); Doc. 356 at 30, 39. Yet in the eighteen days before sentence was imposed, his counsel held calls with third parties "re restitution and sentencing issues" (May 8), placed a May 11 call to AUSA Dan Ryan about Appellant's sentencing memorandum, described next, and, while drafting the Special Master's statement concerning Appellant's cooperation, took a "[t]elephone call from Dan Ryan re the same" (May 20). Doc. 263 at 11, 13; Doc. 356 at 29–30. Whether a sentence informed by information the defendant could not answer satisfies due process is pending below. Doc. 356 at 30.

9. The Special Master's reach extended to the sentence itself. On May 2, 2026, the defense sent its draft sentencing memorandum to the Government and the Special Master together; on May 11 the Special Master's counsel returned it with his comments—five of the twelve about AAPC's value, which he asked be removed—and then, in the same billing

entry, placed a "[t]elephone call to Dan Ryan re the same and related sentencing issues" that the defense was not on. Doc. 263 at 11; Doc. 368 at 21–23. Appellant learned of that call from a billing entry filed sixty-five days after he was sentenced. Doc. 368 at 22. The Presentence Report applied the thirty-level enhancement, U.S.S.G. § 2B1.1(b)(1)(P), to the gross loss figure without the credit the commentary requires for collateral, U.S.S.G. § 2B1.1 cmt. n.3(E)(ii), although the loans sat behind four layers of protection—Appellant's personal guarantee of approximately $2.39 billion, more than $1 billion of his own capital as equity, underwriting at approximately fifty percent loan-to-value, and a zero-coupon bond portfolio with a contractual par value of $1,006,239,867 purchased as dollar-for-dollar principal insurance—the last of which the Rehabilitator sold before maturity for approximately $394 million. Doc. 347 at 12–13 (citing PSR ¶¶ 107, 128); Doc. 281 at 19–20; Doc. 234 at 9–10; No. 26-4309, Doc. 15-1 at 16. The issue is preserved: the credits were reserved in writing and at the hearing; the defense disputed the figure; the Government conceded it—"we agree that the loss overstates, which is why we offered the 15-year cap"; the district court found it—"the loss was overstated . . . because the real loss there was risk"; and the court

never ruled on the credit, yet the uncredited figure produced a range of "actually about 540 months" and a consecutive sentence of 144 months. Doc. 347 at 12–13, 16–17 (quoting Sentencing Tr. 37, 47, 55; citing Docs. 62, 132, 145, 162). A sentence that punishes risk rather than loss—risk on affiliated investments that the North Carolina Department of Insurance approved in writing in 2014 and reconfirmed in 2016, within limits the regulator set company by company, Doc. 174 at 15, 55–56; Doc. 281 at 19–20; Doc. 356-1 at 130—is a pending issue, as is whether punishment for either loss or risk withstands scrutiny of this record. And the conduct that figure punishes was lawful when it occurred: North Carolina first restricted affiliated investment by statute on July 26, 2019—after the charged conduct—as the Government's own sentencing memorandum acknowledges, Doc. 152 at 23 n.12; Doc. 356-1 at 130; Doc. 173 at 34, and the Constitution forbids measuring punishment by a standard adopted after the fact, U.S. Const. art. I, § 9, cl. 3, an objection Appellant has preserved at every stage. Doc. 356-1 at 130; Doc. 354 at 34. That conduct was indicted on February 23, 2023, Doc. 1—after this Court vacated Appellant's first conviction. *Lindberg*, 39 F.4th 151.

10. The Special Master's account of Appellant's cooperation at sentencing followed his request for a release running to himself. On May 14, 2026—twelve days before sentencing—he presented Appellant with a "Consent, Waiver, and Acknowledgement" that would waive Appellant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold," and would release, and covenant not to sue, a class that expressly includes "the Special Master" himself—presented as "cooperation" he "deems . . . necessary" under the appointment order. Doc. 347 at 42 (citing Doc. 190 at 10 & Ex. W). Appellant refused to sign. On May 22, 2026—four days before sentencing—the Special Master filed with the sentencing court his Statement Concerning Defendant's Cooperation, announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. 159 at 3, 5 & nn.5–6. That sequence was placed before the district court within the objection period and has been repeated since; the Government has not answered it. Doc. 347 at 43 (citing Docs. 172, 190, 269, 281, 329). Appellant has no interest in delaying review of any of this; it is the Government that will not develop

the record on what was said about his sentence or share the data behind the figure that fixed it, and the prejudice is his.

**The assets**

11. Appellant has also just placed on the record that in May 2026 the Special Master, editing Appellant's sentencing memorandum, objected to any public statement that AAPC—the largest restitution asset—was worth $2.7 billion, because once that figure was disclosed "we certainly would never receive any offers above $2.7 billion." Appellant's position is that he treated $2.7 billion as the floor: a figure buyers would otherwise exceed. Ten weeks later he valued all of the Primary Restitution Assets, AAPC among them, at no more than $1,231 million on what he called a "desktop exercise" and a "guess," with the reasons under seal. Doc. 368 at 23–24 (citing Doc. 245 at 36–37; Doc. 106 at 30). Under the consent forfeiture order the forfeiture amount is the difference between the restitution and the value of the assets, Doc. 160 at 2 n.1, so the lower figure is what turns a forfeiture of zero into a forfeiture. Doc. 368 at 23.

12. The pending motions also concern what is being done to the restitution assets while the record is withheld. Beckett, valued at

approximately $1 billion, was sold for $134 million, with no accounting of the proceeds. Doc. 360 at 2; Doc. 281 at 39–43. Clanwilliam, valued at approximately $880 million in a signed 2024 purchase agreement, realized approximately $450 million. Doc. 281 at 57. Damovo is next. On July 31, 2026, a NASDAQ-listed acquirer delivered a signed, financed proposal at a $400 million enterprise value; the sell-side adviser rejected it two days after receiving the draft letter of intent, "due to timing and structure," when the acquirer's own overview put a listed-company combination at "approximately six to eight months." Doc. 283-1 ¶ 2; Doc. 320 ¶¶ 3, 5; Doc. 360 at 3–5. The disposition going forward instead yields the restitution estate no sale proceeds at all—about $17.5 million in consent fees, of which the North Carolina insurance estates receive ten dollars. Doc. 339 at 11; Doc. 360 at 3.

13. Everything the record contains about Damovo, Appellant put there: the March 2026 offer and his March 6 notice of it to the Special Master, Doc. 320 ¶¶ 3, 5; Doc. 320-2; the Twelve Seas indication of interest, Doc. 283-1; his state-court filing, Doc. 320-1; and the sell-side adviser's e-mails rejecting the proposal, Doc. 360 at 3–5; Doc. 360-1. The Special Master's account is offered "on information and belief," without a

declaration, Doc. 334 at 2–3; Doc. 339 at 8, and his letters on the transaction are ones "no one outside his circle has seen." Doc. 360 at 3. No federal court order authorizes the disposition, Doc. 339 at 11, and the district court's August 31 order did not approve any sale of Damovo, *id.* at 14. No state-court order authorizes it either. Appellant has objected in both courts, asking the Wake County Superior Court to require NHC to engage the $400 million proposal and to bar any closing until the district court approves the transaction. Doc. 339 at 12; Doc. 320-1 at 9–12. The disposition is instead being carried out, on the Special Master's own account, "through the enforcement of rights by Damovo's secured lenders," Doc. 334 at 2—a private, lender-driven process standing in for the court orders that do not exist—while a financed alternative worth approximately $300 million more, net of debt, remains on the table. Doc. 359 at 5; Doc. 283-1 ¶¶ 2–3. Whether that is an ex parte disposition of Appellant's property—a taking without due process or just compensation, U.S. Const. amend. V—is pending below and preserved for this Court. Doc. 360 at 7, 9; Doc. 339 at 12–14. Each completed disposition places an asset beyond this Court's review before the proceeding reaches it, as Beckett and Clanwilliam already have. The ex parte contagion has now

reached the Southern District of New York. The Share Purchase Agreement for Damovo was signed on October 7, 2026, two days after Appellant placed the Special Master's fee entries on the transaction before the district court, Doc. 360 at 5–6—Appellant has had to reconstruct the Special Master's actions from the fee applications filed with the court, and all of those actions were taken ex parte, without the court approval the appointing order requires, Doc. 56 at 6–7—and the liquidators of PB Life and Annuity Co., Ltd. have asked the bankruptcy court to approve, at a hearing on October 29, 2026, a settlement that would supply the purchaser's condition precedent to that sale. *Czarnocki v. Lindberg* (*In re PB Life & Annuity Co.*), Adv. Proc. No. 23-01000 (LGB), No. 20-12791 (LGB) (Bankr. S.D.N.Y.), Adv. Docs. 558, 560, 566 at 2–4. Appellant has objected there and placed the district court's ex parte record before that court. *Id.*, Adv. Docs. 561, 562, 566–571. Appellant may seek a writ of mandamus and a stay pending appeal from this Court again if Damovo is sold without the district court's approval. No. 26-4309, Doc. 15 (emergency motion for stay pending appeal, filed July 24, 2026).

14. As with Beckett, the Special Master tells the district court that he has no "input into the secured lenders' enforcement process," Doc.

334 at 3, while his billing records show his team preparing a "letter from Special Master re non-opposition to Damovo transaction" and a "comfort letter" on it, Doc. 263 at 15, 30. Without the Special Master's letters—given with the consent right he acquired under the order appointing him—the Damovo disposition is not possible. Doc. 339 at 7–8. And even those letters will not be provided to this Court or to Appellant; they are ones "no one outside his circle has seen." Doc. 360 at 3. If so, no record of the disposition will be before this Court. Appellant's motion to stay the disposition, Docs. 320, 339, 360, remains undecided. On Appellant's filed schedule, the Beckett, Clanwilliam, and Damovo losses and the other documented offsets exceed the $1.655 billion restitution figure, leaving net restitution of zero even if restitution is due. Doc. 281 at 30–31; Doc. 359 at 5. Appellant cannot make any of these arguments to this Court on the present record. Appellant has no interest in delay; the Government is unwilling to develop the record on the offsets or share the data behind the restitution figure, to Appellant's prejudice.

**The structure**

15. The structural problem is plain from the labels. Section 3664(d)(6) authorizes a reference for "proposed findings of fact and

recommendations as to disposition"—nothing more. Doc. 347 at 54. The order appointing the Special Master instead empowered him to identify, liquidate, and clear title to the assets, to receive and distribute restitution payments, and to be paid from the assets he administers. Doc. 288 at 3; Doc. 347 at 53–54. The Special Master has invoked his experience as an equity receiver and bankruptcy trustee, Doc. 343 ¶ 3, and the Government has likened him to a probation officer, Doc. 341 at 19–21. "[T]he labels cannot be reconciled, because the powers actually exercised cannot be housed in any single office our Constitution recognizes." Doc. 346 at 17. Appellant has argued below that a single appointee who takes custody of the defendant's property, gathers the facts ex parte with the prosecution, proposes the findings, sells the assets, and is paid from the proceeds holds the accumulation of powers that "may justly be pronounced the very definition of tyranny," The Federalist No. 47 (James Madison); Doc. 346 at 17–18, and he is not the "neutral and detached judge in the first instance" that due process requires. *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972); Doc. 347 at 57. Every filing in which the Government has responded confirms the point: none identifies a constitutional or statutory source, beyond the proposed-

findings authority of § 3664(d)(6), for such an appointee. Docs. 335, 341, 353, 367. Whether the office so constituted has support in the MVRA or elsewhere is pending below. Appellant has no interest in delay; the Government has been unwilling to develop the record or share the data on any of it, to Appellant's prejudice.

16. Taken together, Appellant contends, this is a proceeding that shocks the conscience. *Rochin v. California*, 342 U.S. 165, 172 (1952). A defendant whose first conviction this Court vacated was retried on argument that filled the gap in the proof, then pleaded in reliance on a process the Government drafted. The Government then edited, in private, the report it offers as proof of loss; its appointee spent hundreds of billed hours with the claimants and the prosecution and none with the defense. The same appointee holds the defendant's property as a receiver, has let an asset appraised at $1 billion go for $134 million and one valued at $880 million go for $450 million, is letting a third go for $17.5 million in fees against a financed $400 million offer, has accounted for little, if any, of it, and is paid from what remains. The Government has produced very little, if anything, and asks the district court to limit the defendant's filings and "bring this matter to a conclusion." And every day the

conclusion comes closer, this Court's ability to review any of it shrinks, because the assets will be gone and the record will not exist. He asks only for the time to bring it here on one complete record, which is the only way it can be brought here at all.

**Why the extension**

17. A deferred-restitution sentence produces two appealable judgments. "[D]eferred restitution cases involve two appealable judgments, not one." *Manrique v. United States*, 581 U.S. 116, 123 (2017). A defendant "who wishes to appeal an order imposing restitution in a deferred restitution case must file a notice of appeal from that order." *Id.* at 125.

18. Appellant's notice of appeal was taken from the judgment and from the order of restitution, No. 3:23-cr-48, Doc. 192, and he has expressly preserved his right to appeal from any amended judgment imposing restitution as a separate, independently appealable judgment, No. 3:23-cr-48, Doc. 329. When final restitution is ordered, Appellant will file the second notice of appeal *Manrique* requires.

19. The additional days are sought for the same reason as the first extension: so that the second notice of appeal can be filed once the final

restitution order issues and that appeal consolidated with this one. That remains the extraordinary circumstance on which this Motion rests: the record is not yet complete.

20. **The request for extension is not made for delay, and the United States does not object to the extension of time.** The content of the Motion itself belongs to Appellant alone. No party will be prejudiced by the extension other than Appellant. Appellant asks only that the remaining dates in the briefing order be adjusted to run from the new due date. These are the extraordinary circumstances under which this extension is sought. He is incarcerated and does not seek delay.

WHEREFORE, Appellant respectfully requests that the Court extend the time within which to file his opening brief by thirty-one days, to and including November 29, 2026 (that date being a Sunday, the period runs to Monday, November 30, 2026, Fed. R. App. P. 26(a)(1)(C)), so that the second notice of appeal may be filed and the two appeals consolidated for briefing.

Dated: October 23, 2026

Respectfully submitted,

*/s/ Vivek Ramachandran*

Vivek Ramachandran
DHAMMA LAW PLLC
418 Broadway, Suite N
Albany, NY 12207
(202) 860-4084
vramachandran@dhammalaw.com

*Lead Counsel for Defendant-Appellant Greg E. Lindberg*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5121 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

*/s/ Vivek Ramachandran*
Vivek Ramachandran

*Lead Counsel for Defendant-Appellant*
*Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record registered to receive such notices in this appeal.

Dated: October 23, 2026

*/s/ Vivek Ramachandran*
Vivek Ramachandran

*Lead Counsel for Defendant-Appellant*
*Greg E. Lindberg*